We'll hear argument first this morning in Case 23-250, Becerra v. Apache Tribe. Ms. Flynn. Mr. Chief Justice, and may it please the Court. The Indian Self-Determination Act requires the Indian Health Service to enter into contracts with tribes to transfer federal health programs that IHS previously carried out for the tribe's benefit. ISDA's basic design is simple. IHS takes the appropriated funds it would have otherwise spent on the federal program and transfers those funds to the tribes in exchange for the tribe's promise to use them to provide the same level of services. And ISDA obligates IHS to add to that core secretarial amount contract support costs to plug specific gaps the secretarial amount does not cover. What the tribes are arguing here is that ISDA also obligates IHS to subsidize the tribe's expenditures of funds that they don't receive from IHS under the contract, but rather collect from third parties as supplemental revenue. Statutory text and context refute that theory, which would upend how the statute has been administered for 35 years. Is this provisions addressing contract support costs say nothing about third-party revenue a tribe may earn? ISDA deals with that separate income stream in other provisions, including one instructing that such income shall be treated as supplemental funding to that in the contract. The tribe's argument that Congress actually intended for such income to determine what IHS pays under the contract would work a sea change in ISDA's scheme by potentially tripling the federal government's contract support cost obligation and eventually transforming what the statute designates as mere support costs into the primary component of contract funding. But there is an even more straightforward reason why the tribe's theory here is wrong. It violates Congress's express command that IHS only reimburse costs that are directly attributable to the tribe's ISDA contract. That prohibition applies notwithstanding any other provision of law and would independently bar the agency from paying the costs at issue here, even if they might otherwise qualify. I welcome the court's questions. Are there limitations on how the tribe can use the outside income? The additional income. There are two statutory conditions that are applicable to how tribes can use this third-party reimbursement income. Those are in 5325M1. And what's that limitation? So there it says they have to use it to further the general purposes of the contract. So if that's the case, I guess their argument is then it is a part of the contract. They have an argument that because all of ISDA Title I is incorporated via cross-reference in the authority section of the model contract, that that provision M1 is incorporated. But that provision also has to be read consistent with the provision of the Indian Health Care Improvement Act, that's 1641D2, and that governs the same reimbursement income and says tribes just have to use it, quote, for any health care-related purpose or otherwise defer the purposes of that law, which includes things as varied as including the presence of tribal members in health care professions. So it is a very open-ended limitation that is not limited to just providing additional contract services. Under your approach, a tribe is worse off if the more they undertake in the direction of self-determination, right? In terms of funding, they are undertaking more health care responsibilities and getting a smaller percentage of the money back from the government. I respectfully disagree with that, Your Honor. I believe you're referencing the mathematical hypo that the tribes have offered in their brief, saying that there's what they call a self-determination penalty because for the same amount of third-party reimbursement income HHS brings in, the tribe won't be able to provide the same level of services. But that assumes that IHS, when it's running its own program, and the tribes are earning the same amount of third-party income. And there are ways that Congress has built flexibilities into the statute to enable tribes to earn more third-party reimbursement income in the first instance and have greater flexibility to spend it so as to leverage it to build their programs in ways that IHS cannot. How is that? I mean, they're getting more Medicare, Medicaid financing that they can then use, but under the interpretation of the government, they're not reimbursed for that. Well, they're earning more in the first instance, for instance, because tribes are running their own programs, can unilaterally decide to serve non-Indians and other non-eligible beneficiaries. Well, what about the tribes that don't want to do that? I mean, I think you said that maybe half the tribes serve non-Indians, but the other half don't and presumably have decided that they don't want to, and then the Chief Justice's question would apply in full force. They're getting less because they've gone the independence route. Well, I think that Congress gave them that flexibility so that they could grow their programs that way, but the other ways in which IHS is differently situated is that IHS can't use Medicaid and Medicare proceeds, which are the bulk of the proceeds that we're talking about, to spend on new construction of new facilities. If tribes can, that can enable the tribes to grow their programs and bring in more third-party income. And the other distinction is that because tribes are able to use their income on any healthcare-related purpose, whereas IHS is subject to a first-use requirement where they have to specifically reinvest that money in Medicaid and Medicare program compliance, there's also just a limitation on how IHS can build the program, even aside from the decision to serve on Medicaid. Well, is that really so different? I mean, presumably the tribes also have to make sure they're compliant with Medicare and Medicaid, so presumably they're having to put money into the same things. So I believe Congress thought it was a difference when they deliberately exempted the tribes from that requirement and said that they can prioritize other uses of these funds, including program expansion, rather than having to ensure complete compliance with Medicaid and Medicare in the first instance. Well, I mean, they have to make sure that the Medicare and the Medicaid monies keep flowing in, and for those monies to keep flowing in, they have to be compliant with the program terms. Right, but they have a sort of accounting and prioritization flexibility that IHS does not have. But the other thing I would say about all this is we're talking now about the tribes' argument that there is some kind of a contractual condition having to do with spending the money that shows that Congress would have wanted this to be considered to help determine contract support costs. But I think when you look at the contract support cost provisions themselves, they tie the obligation to pay these costs to the federal program that is the subject of the contract. And the federal program that is the subject of the contract is the program that the tribes agreed to carry out in exchange for the secretarial amount to the same extent as that secretarial amount funding will allow them to perform. Counsel, I had thought that a lot changed after 2010 and the tribes became payer of last resort under Obamacare, and so they've taken on a lot more obligations here. Is that right? The payer of last resort provision means that when there are different available sources of funds that the tribes of the IHS program, among the available sources of funds, we don't interpret that provision to require tribes to enroll in it. No, but the ones that have, that's what's changed. That's why we're here, I think, in part. And so they have to collect from Medicare and Medicaid, right? Again, I don't think that provision requires them to enroll. Once they take on this obligation, they have a duty to collect the funds from third parties. We have not disputed that reading of the payer of last resort provision in this case, but I'm not sure that it's IHS. Okay, so they have to collect it, and then the question is how they spend it. And M1 says it has to be consistent with the general purposes of the contract. You've indicated that. And the contracts are specific about what services they provide, EMS in some cases, other kinds of particular services, right? Yes. So the general purpose of the contract is Indian health, right? Yes. Indian health, right? Yes. Not non-Indians? Yes. Okay. And it's even more specifically limited by the particular services the tribes contracted to provide, like, for example, in one of the cases, EMS services, right? I agree with that, but the services that the tribe is ‑‑ So if you do agree with that, then what's the problem here? You raise the specter that they're going to expand their programs to help non-Indians. Maybe they're free to do that. You're right, statutorily. But in terms of the contract support services that would be required to be paid from the government, it would seem to be limited, A, as you've agreed, by the general purpose of the contract, which is Indian health, not non-Indian health, and, two, more specifically by the specific services that the government has contracted to allow the tribes to provide, particular services. I don't understand that to be the tribe's position in this case, is that the extra contract support costs they're asking for would be limited to that tied to reimbursement income that came from serving only? It has to be consistent with the general purposes of the contract, M1. So those purposes are the specific services that have been contracted to be provided. So I would not cite, Your Honor, on imposing that limitation if you were to say that there is some additional contract support costs obligation tied to third-party reimbursement income. Would that take care of all the government's concerns about and the trade afforables about the money being used for non-Indian health care? Well, again, that wasn't what the lower court found here, and I don't believe that's what the tribes are arguing. But, I mean, I think we would still have a situation where, because third-party reimbursement income has been increasing and because that would then directly, according to the tribe's theory, determine how much contract support costs the agency is paying, and that amount would grow and snowball over time, it would overtake the secretarial amount of the primary. Well, it certainly has grown over time, but that's a function, again, of them becoming payers of last resort, the way IHS sometimes is. And that is a big change. I grant you that. But I think you've just agreed that the properly read M1 would limit it to Indian health care and the particular services the government has contracted for the tribes to supply. So I would agree that the estimate we provided about how, if the tribes' theory were adopted or imposed on a program nationwide, that would amount to about $800 million to $2 billion per year. That would be different, I assume, a lot smaller under what I've just described, wouldn't it? It would be smaller. I don't have the information to tell you how much. Is that issue before us? That wasn't what the lower courts decided here. I don't take the tribes to be excluding reimbursement revenue from non-Indian beneficiaries from the kind of contract support costs they're asking for, and so I would be open to this court to rule that way. I had thought that, maybe I'm wrong, but Mr. Unikowski can say so, but I had thought that one of Mr. Unikowski's arguments sounded in this vein, that, you know, to the extent that the government was saying, oh, there are all these possible abuses out there in the world, that there was a ready solution, which was to limit it to the services that the tribe is providing to Indians under the contract. Just to clarify, we don't think it's an abuse to, you know, take advantage of the flexibilities that Congress has allowed to decide to serve non-beneficiaries if it will not diminish the care available to eligible Indians. I'll take that as a friendly amendment. But I understood my friend representing the northern Arapaho to say that if the tribe actually does spend third-party reimbursement income on program services, that that should lead to a different result. I don't think that solves the problem for his argument there, but I didn't take him to saying that you limit the kind of third-party reimbursement income to just that provided to Indians. That is not something I have seen raised in this case. That's not raised at all. I mean, that's just not raised at all. No, I don't think so. I didn't see it. Counsel, you've been talking about this costing a lot, and may well be. And I'm interested in the other side's response to the series of questions that are going on now about that limitation. But I understand that in terms of tribal health care, it's about one-third of what is spent by the average American on their own health care. So it's not as if all of this money is bringing us a luxury health care spa. It's actually bringing us to a fairly minimal level of health care for tribal members. I still don't understand how your interpretation makes any contract support system cost, or many of them, recoverable at all, because you seem to be saying that if you're providing services with a third party like Medicare or Medicaid, why would that then include contracts with a consultant who comes in to do the other services that the contract requires for the government? There's always third party contract supports that are reimbursed by the government. Why is this any different? They're not providing the service because of Medicaid or Medicare. They're providing the service because of their agreement with the government. This is only a reimbursement. It's not a required service agreement. So I do want to make sure to respond to the point that Your Honor raised at the beginning of your question about the underfunding of Indian health. And IHS agrees with that and is seeking additional appropriations from Congress, but just doesn't believe that upending the funding scheme in this way, in an open-ended way. No, that assumes the answer to the question, which is that it's upending. If it's clear by the text that if you provide services, you'll be reimbursed for them and for contract support. It's the contract doing that, not upending it. Yes. But to respond to Your Honor's question about 5326 and the two prohibitions there. So you were, I believe, referencing the second prohibition, which is that IHS funds cannot be spent to pay costs associated with any contract that's not with IHS. We understand that prohibition to be limited to contracts by which the tribe receives funds, which is consistent with what we understand to be Congress's motivation to not have IHS's appropriated funds be used to subsidize other funding schemes. But even if you disagree with me about that, I would point you to the first prohibition in 5326. That is the one saying that IHS's appropriated funds cannot be used to reimburse costs that are not directly attributable to IHS contracts. And we think that that language squarely applies here because attributable is asking for a... The contract requires them to seek reimbursement. How can it not be attributable? As Justice Gorsuch pointed out before, they didn't have to do it. Now they're forced to do it by contract. Because we think attributable is calling for, I mean, the word means capable of being produced by or brought about by or caused by, and then you add directly, which is an adverb that doesn't appear the other times, the three other times that uses the word attributable. And there's an extended... Counsel, this is a complicated statute, and so I have a question about how it actually works. It seems to me there's an argument that these costs should be included in the secretarial amount. Am I right that you don't dispute that the cost of collecting the Medicare and Medicaid falls in the secretarial amount? That's correct. Okay. When IHS collects the money, does IHS then spend it? Yes, it has to first dedicate it to the facility that earned it compliance with Medicaid and Medicare, but yes. Right. So if the tribe is standing in IHS's shoes, why shouldn't the secretarial amount... I don't understand the tribes, and Mr. Unikowski can address this point. I don't understand the tribes to be saying it should be part of the secretarial amount, that the secretarial amount includes the cost of collection. It's not apparent to me why it wouldn't cover the cost of expenditure in the same way that you're saying IHS spends that money. Because this... Well, there are some... I'm not sure this is Your Honor's question. There are some overhead administrative functions that are included in the secretarial amount if they're the kind of thing that the secretary could have allocated to that tribe. But no, the cost of spending income from third parties is not part of the secretarial amount because that is limited to the funds the secretary otherwise would have provided for the operation of the program. And then the contract support cost obligation is itself tied as funds to support that amount. Except my confusion is you're saying that the secretarial amount does include the cost of collecting the third-party income, right? Yes, because... Yes, and you incur overhead costs when you spend that third-party income as well, which I take to be the entire dispute here is whether they get coverage for that, right? Right, but I guess I would say the cost of collection and billing, that is associated with providing the services using the secretarial amount itself. These later costs of deciding how to spend those funds, which may not even happen during the same contract period, that is not tied up with the services being provided in the first instance. So the billing function, we think, comes over with the secretarial amount because it's tied up with providing the services and getting the funds in return, but not with the later decisions about how to spend this money, which could be spent on building a new facility, starting a new kind of health care program the secretary didn't previously run on the tribe's behalf, that kind of thing. I think the answer, though, if I understood it correctly to Justice Barrett, is that when IHS does collect third-party payments, it spends that money to advance Indian health, and that includes some overhead costs. Yes, that is correct. But what the statute is telling us to look to for purposes of deciding what counts for contract support cost reimbursement is the federal program. My question was IHS. And so when IHS spends that money, it incurs some overhead costs, and those are obviously paid for by the federal government. Yes. And then just back to where we were earlier. You said that Mr. Unikowski didn't raise an argument. I've got page 27 of the brief in front of me. At a minimum, contract support costs are recoverable when program income is used to fund enumerated services within the contractual scope of work. And it says on page 29 that the Northern Arapaho are prepared to prove that every penny of program income was in fact spent for activities enumerated in the contractual scope of work. So I don't understand that to be an argument along the lines Your Honor was suggesting. Why not? My argument was, my question was, aren't they obliged under M-1 to spend on general purposes, that's Indian health, and aren't they also obligated to spend in accordance with the contractual services that they've agreed to provide for the government? That is exactly what's laid out in those pages. I don't think they're distinguishing between serving eligible Indian beneficiaries and those that the tribe is eligible to serve once they make a determination that they can. But the other thing is I believe for at least one of the contract years at issue, we only have one set of contracts for the Northern Arapaho. In there they refer to the resolution that the tribe made to serve non-beneficiaries and talk about that in the course of, I think, the scope of work or something like that. So that's why I didn't understand that to be an argument about distinguishing between those two different kinds of reimbursement schemes. But, of course, they can clarify that. Can you finish your answer to the first question that Justice Gorsuch just asked? Yes. So I took Justice Gorsuch to be saying that shouldn't, or perhaps to be suggesting that it's not funded by the secretarial amounts, the appropriated funds, but also third-party income because that's what IHS would do when running these programs itself. And I was pointing to the statutory phrase, the federal program that is the subject of the contract, and that's in 5325A3R1. And the program that is the subject of the contract is the program that the tribe is agreeing to undertake in exchange for the secretarial amount. And you know that from model contract language that appears in the contract. For instance, in the San Carlos Apache Tribes contract, it's at JA54, where it says the contractor shall not be obligated to continue performance that requires an expenditure of funds in excess of the amount of funds awarded under this contract. So that is tethering the obligation to perform to the secretarial amount. There's also a provision, which also comes from the model contract language that's enacted into the statute, and in the San Carlos Apache Tribes contract, it's at JA51, that says the purpose of the contract is to transfer the funding and the following related functions, services, programs, and activities. So we think the subject of the contract language in the contract support cost provision, which the next subclause, which also refers to the federal program we think is referring back up to, is the program that is delineated by the secretarial amount, the one that the contractor is promising to undertake in exchange for the secretarial amount and not services funded by other funding streams. How do you square that view and that interpretation with the rule of construction that the statute gives us, which says, I'm looking at 5321G, that each provision shall be liberally construed for the benefit of the Indian tribe participating in self-determination. So to the extent, I don't know whether we need to think of this as ambiguous or not, but they make an argument about what those same provisions mean. Why aren't we bound by this statutory mandate to construe them in their favor? Because we believe that statutory language is calling for courts to apply the Indian canon, the common law Indian canon that has been applied in this court's cases. It doesn't say that. It doesn't reference that. Can Congress not come up with its own liberal construction provision? It could, but it used the same buzzwords that come from this court's articulation of that canon, which is liberally construed and ambiguities resolved to the benefit of the Indians. That comes from how this court has phrased the canon in its cases like Chickasaw, Montana Blackfeet. So I think if Congress was asking for something different, it wouldn't have used the exact same phrasing that calls up the common law canon and all of its roots. And those roots include... You can finish your answer. Yes, thank you. Those roots include looking at context. They include looking at statutory structure. They include thinking about things like common sense. And we've laid out some examples in our reply brief. Thank you, counsel. Justice Thomas, anything further? Just to be clear on that last point, I know some of my colleagues believe that we shouldn't be making choices of who to favor in interpretive principles, but it's not us making that choice. It's the statute making that choice, correct? Yes, the statute calls for the application of the Indian tradition. All right, so if there is an ambiguity, we should follow the dictates of choice specified by Congress, correct? You think there's none, but if we believe there is. Yes, but I believe you can... All right, thank you, counsel. Justice Kavanaugh? Can you just, on the funding amount, $800 million to $2 billion, put that in context here? Because that number is not contextualized. Sure. So IHS's current contract support cost obligation is about $1 billion per year. Its total funding is $8 billion per year. And because contract support costs are discretionary funding, it falls under discretionary funding caps government-wide, but also applicable to this committee. And so it stands to reason that if all of a sudden contract support costs just explode, Congress is going to have to find the cuts elsewhere to keep the budget under the discretionary spending caps. And we believe there's a real danger that that funding is going to come from the other 40 percent of IHS's budget, which is providing direct services to tribes that decide not to enter into these contracts. Because Congress couldn't cut, without changing its rules, mandatory spending, correct? So it would have to come out of the other discretionary funding. That's what the cap applies to, yes. And, you know, IHS has asked for this funding to be transferred to mandatory funding. It's asked for years. Congress has not done that. When you say this funding, which funding? Both just contract support costs in particular, and also all of IHS's. But right now it's still discretionary. Right now it is still discretionary. It's subject to the cap, okay. Yes. And that would, okay, I understand that. On the 35 years point, Justice Gorsuch, I'm just interested in your further response to things changed in 2010, after the Health Care Act was passed in 2010. What was your full response to that? Do you see that as causing the change that prompted this issue, or where else do you see it coming from other than the overall underfunding problem that Justice Sotomayor raised? So I don't understand. Congress in the Affordable Care Act enacted this payer last resort provision, but it's not part of the Indian Health Care Improvement Act. And so I don't understand Congress to have wanted to affect a fee change. Is the funding by way of that provision? I'm not aware of anything in the legislative background suggesting that that was the case. I'd also say that I understood the tribes to be saying that there were changes made in 1994 that actually affected this change. They think that's by the addition of M and also the fact that the model contract now has the authority section that cross-references all of Title I. I think that would be a very sort of triple bank shot way of getting across this meaning when Congress is otherwise addressing the relationship between contract funding and the receipt of third-party income. But also, if that is what Congress tried to accomplish in 1994, nobody noticed for decades. IHS has been administering this program the way we've been advocating for in this case since that time. Is anyone in Congress raised concerns about that, that you're aware of? I'm not aware of this contract support cost dispute vis-à-vis third-party reimbursement income coming up in the background of these laws. I'm not aware of it ever being raised to the surface. Thank you. Justice Barrett? So the questions that I was asking you before really related to 5325A1 and kind of asking you why this wouldn't have been included in the secretarial amount. I just want to clarify something about 5325A2. So as I understand it, A2A, the example that kept coming up in the briefs was workers' comp. And A2B, the example would be legal services from DOJ, something that IHS doesn't have to provide for itself or hire lawyers for itself because it has government lawyers outside the agency that it can rely on, correct? Yes. Yes, okay. So in arguing that these cannot count as contract support costs, does your argument really hinge on the definition of the program in A2A? Because it seems like these would not be expenses, or I took some of your answers in your brief, your answers today and your brief, to be saying that these are expenses that the secretary wouldn't normally incur in spending the money because the secretary has constraints in the way it can spend third-party income that do not apply to the tribe. Do I have that right? Yes. Okay. So why couldn't these then be contract support costs under 5325A2 because they are not costs that are normally, and I want you to ignore your argument about the threshold 5325A2 for this point and just look at 5325A2A. Why can't they count as costs that the secretary does not incur but the tribes do? Is your argument just because they're not incurred in operation of the program? Yes, that's correct. But if I take your honor to be saying that these would qualify under A2B? No, I'm asking if they could qualify, or why can't they qualify under A2A? So I think that what A2A is asking about is actually the expenses, like the overhead expenses or the expenses like worker comp that comes along with spending, so not with the underlying activity of earning the money in the first instance. But aren't these costs that tag along with spending, like spending the third-party funds to do whatever it is the tribes choose to do to further the general purposes of the contract? Right, but the same way that these costs tag along with providing the services when you're running the program in the first instance. So when we're talking about the expenses, we're saying the added workers' compensation expense that comes along with providing a service. And so I take the tribes to be arguing that if the service is funded one way or another way, that that's why the expense would be eligible for contract support costs if it is part of the federal program that is eligible for funding. And so the most important part for the government's purposes is that you define this to be outside of the program? Yes, I mean, that's part of our argument. We have the other statutory... Justice Jackson? Can you define it to be outside of the program despite the fact that Section 1623B requires for IHS or the tribes to be the payer of last resort? Yes, because for the reasons I was saying, the program defined for the funding provision 5325A is the federal program that is the subject of the contract. The payer of last resort provision, again, not part of ISSA, is just speaking to when they're eligible sources of funding which payer has to pay that. But I'm not sure I see that as changing the meaning of the federal program that is the subject of the contract or makes the tribe act as a contractor when it spends third-party reimbursement income. All right. And if the costs balloon, which seems to be a lot of your concern, you explored with Justice Kavanaugh where the cuts might have to come from, but I'm wondering if there's something that precludes renegotiation of the contracts in light of potential cost escalations of the nature that you're talking about. So I take the tribes be arguing that we don't have flexibility to change the model contract language that incorporates M1 in the way that they think gives rise to this obligation to pay contract support costs. I'm not sure. I just don't know as a matter of just interest here how these contracts work. There's no opportunity for the government to renegotiate terms? We would have to see what a decision says and figure out if that hinges on particular contract language that's not required to be in the contract. What about an amendment from Congress? I mean, you say it isn't clear that Congress has ever really focused on this interpretation, so that's a possibility if there's a big ballooning and a problem that arises from that. Sure. It's always the case that Congress could revisit this statutory scheme and take some action to address this problem, but we just don't think that Congress created this problem in how it set up the funding scheme in the first instance. Thank you. Thank you, Counsel. Mr. Unikowski? Mr. Chief Justice, and may it please the Court, the Self-Determination Act entitles the tribes to recover the disputed contract support costs in this case. The bulk of the disputed costs are indirect costs. Under Section 5325A3A2, such costs are recoverable if they're incurred in connection with the operation of the federal program, function, service, or activity pursuant to the contract. The disputed costs in this case meet that description. If IHS was running tribal health care, it would collect program income and spend it on health care services. In the ISDA contract, IHS transferred to the tribe the responsibility both to collect and to spend the program income on health care. So when the tribe carries out health care services using program income, it does so as a means of fulfilling its contractual obligation to further the general purposes of the contract. So it's acting pursuant to the contract. And a similar analysis applies to the smaller amount of direct contract support costs sought by Northern Arapaho under Section 5325A3A1. Section 5326 is no barrier for the tribe's recovery of costs in this case. The costs are directly attributable to the contract because they arise from the tribe's work pursuant to that contract. And they're not associated with any third-party Medicare or Medicaid provider agreements because the costs have nothing to do with the work under those agreements. Finally, ruling in the tribe's favor would further the purposes of the ISDA by promoting tribal self-determination and ensuring that adequate resources are available for health care in chronically underserved communities. I welcome the Court's questions. Mr. Unikowski, what do you do with you went directly to A3A. What do you do with A2? So, Your Honor, we don't think we need to independently satisfy A2, but if you don't agree with me on that, we do. So you think it's just surplusage? No, it's not surplusage, Your Honor. So I think that the sequence – I want to make clear I think we do satisfy it, but I just want to – our first-line argument. In 1988, Congress enacted A2, and there's lots of disputes after that over what was covered, what wasn't covered. IHS was chronically not paying. And so in 1994, Congress added A3 to clarify that those categories of costs are deemed to satisfy A2. So it seems to me that if Congress goes out of its way – Where does it say that? Well, it says shall include. So if you look at the ordering, A3 says the contract support costs that are eligible costs for the purposes of receiving funding under this chapter shall include the enumerated categories. There's no cross-reference to A2. There's no proviso. There is a proviso on A1, but not A2. So it just seems to me, viewing this text literally, if you satisfy A3, you prevail. And that's the point of adding this clarification. But I just want to be clear, if you don't agree with anything I just said, that's not essential to our position. If you think that we have to satisfy A2, emphatically, we think that we do. A2 says that the costs shall consist of an amount for the reasonable cost of activities which must be carried out by a tribal organization as a contractor to ensure compliance with the terms of the contract. That is satisfied because M1 is a term of the contract. When we are collecting and then spending the program income, we are acting as a contractor. We must, under the contract, collect this money and spend it on health care services. So we're acting as a contractor just as much as we're acting as a contractor when we spend money on the secretarial amount. So based on the first part of the argument, there's a number of questions that arose which I wanted to answer. I wanted to answer the questions about non-beneficiaries as well as some of Justice Barrett and some of Justice Kavanaugh's questions. Can I just ask you before you do that really quickly? So M1 is a term of the contract, but what do you say about their argument that the M1 obligation is more open-ended than the scope of the work itself? Well, I mean, it does give the tribe a measure of discretion. It talks about general purposes. I think that has to be read in conjunction with the contract itself, which doesn't say that the purpose is just generally to promote health care or generally to promote self-determination. There's a purpose provision that says the purpose of the contract is to transfer an enumerated set of obligations from IHS to the tribe. So it seems to me that furthering the general purpose of the contract requires slotting it in one of those enumerated purposes or at least something that's really close to those purposes. I realize the word purpose has the word general attached to it, but I don't think that that entitles the tribes to just do whatever it wants to or spend the money on health care in general. It's got to be tied to the purpose provision in the contract itself. Well, but I mean, if you add the direction to interpret the statutory language in favor of the tribes, that purpose provision doesn't seem to me to be a very significant constraint. I mean, the argument on the other side, or at least one of the concerns, is that the tribes would be able to expand the provision of health care to all sorts of areas that do not primarily benefit tribal members and yet still be entitled to reimbursement. All right, so let me address this issue of non-beneficiaries head on because I understand it came up significantly in the first part of the argument. Okay, so first of all, for about half of tribes, including San Carlos, they don't serve non-beneficiaries at all. Even for the others, it's often very little. So let me just explain what northern Arapaho does because a statement was made in the first half of the argument about northern Arapaho services and non-beneficiaries. Northern Arapaho does serve non-beneficiaries, but only if they're employees of northern Arapaho's health care program. That's less than 3% of the total number of users of northern Arapaho's program. So if there's a nurse who's non-Indian, who lives on the reservation and works at a northern Arapaho clinic, and then she wants to get her blood pressure checked, then as an employee benefit, she can do that in the same building. She doesn't have to drive potentially a long distance in central Wyoming to some other clinic, but that's not paid for by IHS. She has to pay out-of-pocket or realistically from her own insurance policy. So none of the secretary's funding ever goes to the provision of health care to those non-beneficiaries. That's not true for some tribes, is it? No, I think it's true for all tribes. The tribes can serve, but they can't spend the government's money because there can't be a diminution of health care services for Indians. So I think the way it works is the non-Indian has to pay out-of-pocket or from the person's own insurance policy, and the tribe collects that money. I will acknowledge the tribe does consider that to be program income. That's not a question raised in this case. But the tribe thinks that if it's actually collecting that money, that's program income. But it then spends every single penny of that money on services for Indians. We never, ever spend the program income that we obtain on services for Indians. And that's true for all tribes. Yes, I think it is true. Absolutely it's true. The non-Indians who use the services, they have to pay from their own insurance policy. The tribe might collect that money and spend it, but the tribe is not spending program income to fund services for non-Indians. Well, but you're talking about the principle, but we're talking about support services. And I assume they don't, well, maybe they do, allocate support services differently depending upon which services go primarily to non-tribal members and others to tribal members. So historically Northern Arapaho has done that just because it's such a tiny percentage. That's a question that's not raised in this case. I think that the government, if it wishes to, can argue, can defend a case on the ground that a portion of the services that are allocable to non-Indians shouldn't be included. And that's fine. That can be litigated. I mean, the argument on the other side is that there's this provision, Section 1680, that says, 1680C, that says that services provided to non-Indians shall be deemed to be provided under a disagreement. But that hasn't been construed. It's not an issue in this case. So we'd ask the court to reserve that question. So if I can understand what your argument on page 27 refers to, what the limitation is in that argument and what it's not. Okay. So the alternative argument we have made is that every single penny program income that we receive under these contract years, we spend it on services enumerated in the scope of work for Indians only. And that's really because the scope of work for Northern Arapaho is pretty broad. It's like all outpatient medical services, dental services, radiology. There's behavioral health. There's lots and lots of different services that are transferred in the scope of work. And so all of the dollars we spend are allocated towards programs in the scope of work. But I just want to be clear, the broader argument, we're not saying you can use program income to offer services to non-Indians. I think all those services have to go towards Indians. That's what the general purpose of the contract is. It's to serve Indians. Put aside the question of what you are doing and focus on the question of what the statutory language means. So what exactly are the general purposes of the contract under 5325M1? So the purposes of the contract, I'll get the modifier general in just one second. The purposes of the contract are laid out in the self-determination contract itself. And that's part of the model agreement. It says the purposes are to transfer the enumerated set of services from IHS to the tribe. That's the purpose. So in terms of what general purpose means, I think that gives the tribe a little bit of discretion. Just as one example, tribes have generally construed general purposes to open the door to building facilities at which the services will be offered. So for instance, the responsibility for dental services is transferred. Tribes have construed that language to say you can build a clinic. Could you give me a simpler answer? Or maybe it doesn't lend itself to a simpler answer. Are the general purposes of the contract simply to further Indian health? No, I think it's narrower than that, Your Honor. Okay. In what way is it narrower? I think it's the general purposes. You look at the purpose of the contract as laid out in the contract itself, and I think the word general modifier requires that at least it be related to those purposes, right, not just anything to do with Indian health. I just want to make one other point about that. I still don't understand. Could you just tell me what it means? Yeah. What does it not mean? Suppose the tribe wants to set up a scholarship program for tribal members or Indians to go to medical school. Does that fall within the general purposes of the contract? I probably would say no. This question has never come up. It's never been litigated a single time for a practical reason. Yeah, well, now it's being litigated. No, it's not, Your Honor, because there's no disputes in this case that we satisfy that general purposes provision. But we have to say what general purposes means. I don't think so, Your Honor. You should hold that as long as that is satisfied, as long as the tribe are adhering to that contractual obligation, then it's acting pursuant to the contract. The reason this has never been litigated, what general purposes means, is that the amount of money that the tribe gets is the sum of these two funding streams, and Congress understands that that sum is necessary just to serve the services under the contract. Mr. Unikowsky, there's not so much money here that the tribes are spending this on frolics and detours, right? That's correct, Your Honor. There's not even close to that money. There's not even enough money to provide health care to the Indians on the reservations, and you're operating out of decrepit old buildings in many cases, and that's what we're really talking about. Nor are Indian health care services providing massive benefits to non-Indians all across America. We're talking about a reservation in central Wyoming with an incredibly poor population of Native Americans. And general purposes of the contract, you'd agree it has to be Indians. One hundred percent, I agree, Your Honor. And in your contract, in terms of what's enumerated as the general purposes, include outpatient ambulatory medical care and primary care, nursing, mental health, the clinical medical laboratory, radiology, physical therapy, the pharmacy, optometry, dental care, and community health. You'd agree it has to be limited to those things too. Yes, Your Honor, absolutely, one hundred percent. And if there were a tribe that had a – you seem to provide pretty much the full gamut of health care services, but if there were a tribe that didn't, that said, you know, we're only providing emergency services, something like that, then it would have to go only to emergency services. Is that correct? I agree. I mean, that's maybe more of a question for Mr. Miller, who his client has such a contract. But yes, that is my understanding of general purposes. What do you do with their argument that there are expenses that the government doesn't incur, like building buildings, that that's not included in their formula? Why should you get support service funds for that activity? So my primary answer is that we actually don't. I mean, there's a back and forth in the briefs about this, but the cost methodology of IHS actually requires us to deduct the construction costs from the cost base when we're calculating contract support costs. So translating to English what that means is that if we're essentially hiring a subcontractor to build a building, we just transfer a bunch of money to the subcontractor. That doesn't generate overhead costs. It's the subcontractor who has the overhead, not us. So under the IHS's cost allocation methodology in the Indian Health Manual, we have to deduct those costs anyway. So as a practical matter, it really doesn't come up. The other thing is it's not like Congress doesn't like construction. It's just there's two separate appropriations provisions. Like there's one to the Indian Health Service for services, and there's a separate stream for construction. And so Congress has just ensured that there's no mixing, that a certain amount of money is for services and a certain amount is for other services. To the extent that the government doesn't pay for certain things or they're not included in the program, you're not getting reimbursed. We don't add. We don't seek contract support. Could I ask one? I mean the government's, one of their biggest arguments is the practical consequences of this, that you're going to be depriving money from direct service tribes. How do you respond to that? All right. If I can offer a couple of responses. So first of all, the liberal construction provision in the self-determination contract says that the provisions of the statute and contract will be construed liberally for the benefit of the contractor. So that's not all tribes in general. That's for the contractor in particular. So I think the court should remain focused on the contractor's interest when applying that. Second of all, I think it's more. It's a nice answer. Well, no, but I have a different answer. So I think it's notable that two pan-tribal organizations, the National Indian Health Board and the National Congress of American Indians, both of which have members, both ISDA and non-ISDA members, have submitted amicus briefs in our support because I think the feeling is among tribal organizations that the Self-Determination Act is so important for Indian sovereignty that we're willing to accept the risk that Your Honor just identified. And the risk is if, just so I understand it, if Congress doesn't change the discretionary funding cap that applies to IHS generally and you prevail in this case, it necessarily will mean less funding for other tribes that IHS directly provides health care for. That's assuming that the appropriations amount will stay the same, and that's completely speculative. I said if. If it stays the same, your position will hurt. The other tribes. Theoretically, yes, if there's a limited pot of money and more goes to one thing than less goes to the other. Exactly. That's why we've got to think about this more generally than just your first answer, just sort of my words a bit narrow. Thank you. Thank you, Counsel. Justice Thomas? Justice Alito? It's my understanding that the tribes have been able to collect program income subject to 5325M1 for many years. When was the first time a tribe made the type of challenge that is before us here? I think it was in the early 2010s, but I think there's a good explanation for that, Your Honor. So how is it that these tribes, represented by excellent attorneys like you and Mr. Lloyd, left all this money on the table for so many years? So there's two basic answers. One is that for many years there was these appropriations caps under which tribes couldn't even recover contract support costs on a secretarial amount. It took two cases from this court, the Cherokee Nation case and then the Salazar v. Rama Navajo chapter case in 2012, for this court to hold that the tribes actually are entitled to all the contract support costs under the statute, and that's when these lawsuits started being brought. And the second point is the pay or blast resort provision that Justice Gorsuch raised. So that's when tribes really started feeling like they had to go out and collect this money. They had no choice. And by the way, it's not just the statute. Our contract, Northern Arapaho's contract, also requires us to collect it. And so we were encountering all these support costs. So this issue just didn't come up. I don't think that there's some kind of tradition here that's really relevant because the facts on the ground changed in the early 2010s. That's when the tribes started bringing these lawsuits. All right. So the statute of limitations for this is six years, right? Correct. And if the government is right that the annual cost of accepting your reading could be $2 billion, then the first-year bill could be more than $12 billion. I don't think that's the case here. So first of all, why would that not be? Well, first of all, we don't know where that estimate comes from. That's not in the record. It's just a conversation between someone at IHS with the SG's office giving these numbers that come out of nowhere from our perspective. Well, what numbers do you have? We don't have any numbers. I mean, having to talk to people in this area, people tend to be skeptical of these high numbers. The government takes the position it represents that contract support costs will start exceeding the secretarial amount. I don't think that's ever happened. That's certainly not true in these cases. I think that's extremely speculative. And also, the other thing is, I mean, it's true there's a six-year statute of limitations, but I don't think every single tribe in the country is going to necessarily bring these suits. I mean, I can't predict. Why would they not? I mean, maybe they – I mean, I can't predict the types of litigations that are going to happen, but, you know, I mean, this is what the statute requires, Your Honor. I mean – What if it turns out that their estimate is right? It's $2 billion a year, so the bill for the first year is $12 billion. I mean, maybe today $12 billion is not very much money, but then what would we do? Would we say, well, gee, we made a mistake. We decided the case based on the wrong assumption? You know, I don't think that the amount of money and hypothetical judgments from a number that is not in the record and was just taken out of nowhere is a basis to decide this case against the tribe. Well, if it has such – if your reading has such severe consequences, does that say something about the plausibility of the reading? I don't think – I just respectfully disagree. Congress hid this mastodon in an anthill, in an ant hole, or whatever it is. Elephants in mouse holes. I don't think it's really an elephant in a mouse hole. I mean, the amount of program income – we're already getting contract support costs in the secretarial amount. There's, in some cases, a smaller, occasionally larger amount of program income, and we're just seeking the same reimbursement based on the same rate for that additional unit of income. So I just – I don't think it's that extreme of an outcome. Thank you. Thank you. Justice O'Meara? Justice King? Justice Gorsuch? I just want to make sure I got it right with respect to why this happened. You brought suit in 2011, I think. Is that right? Somewhere in there? One of you did. It's not my – ours is 2016. 2017. All right. Okay. I think one was 20. But we weren't – we didn't even enter into these contracts until then. Okay. So you couldn't have brought it before then anyway. No. And in 2010, you became the payer of last resort. You have a contractual obligation to collect these monies. Right. Obviously, that's why that now it becomes what happens about spending it. Right. Plus, tribes weren't – I mean, again, like before 2012, tribes were getting much less than they were entitled to under the statute because of these appropriations caps which have been lifted by Congress after this court's decision in Salazar v. Rahm in the Navajo chapter. That's what got a lot of this litigation. Do you know how much money your client is seeking in contract support costs, roughly? In this case, we're seeking about $1.5 million for 2016 and 2017. $1.5 million. About that, yes. So this $800 million to $2 billion that's on page 44 of their brief, there's no site. No. It's an unexplained estimate by IHS that's not in the record of how much something is going to cost. And that's also premised perhaps on their understanding that general purposes can include creating spas for non-Indians. Yeah. It's like there's this language in the brief about cycles of spending money, and we think that's completely implausible, and that may have been baked into this unexplained number, Your Honor. We don't usually allow record evidence to be introduced for the first time in this court without a citation to anything, and it might include services that would not be even covered under your interpretation of the agreement. I agree. I also think the court can take judicial notice that unexplained government estimates about how much things will cost are not always perfectly accurate, so we'd ask the court to apply that principle here. Thank you. They usually underestimate it, but anyway, that's a separate issue. Do I have it right that the question here is about the pot of money that comes in from third-party payers from Medicare, insurers, tortfeasors, and what have you, and then you take that pot of money, which is under a separate statute, and you spend that for health care services, correct? Equivalent under a separate statute, it's 5325 M1 and M2, but yes, we take the money from Medicare and Medicaid and we spend it on health care. And if you were to lose this case, what you do, as I understand it, what has happened previously is that you use that pot of money, which is separate from the IHS-appropriate money that comes to you, you use that pot of money to pay not only for the Indian health care services but for these overhead costs, right? It comes out of that pot of money. That's correct. We'd have to use that or maybe the tribe's general treasury, but we wouldn't get it from the sector. Okay. And what do you do with, I don't know that we've mentioned it as much, 5325 M, the provision that says the third-party income is not a basis for reducing the allocation that comes from IHS, which suggests that Congress was concerned about, oh, because you get this third-party money, maybe the IHS amount should be reduced, and Congress wanted to say, no, that's not correct, and from that the implication would be surely they were not anticipating, oh, that it would increase. I just want to make sure you can respond to that. Yeah, I don't agree with that inference. I think that M should be construed literally. As you said, Congress was concerned that IHS would deduct because of the program income, and it said don't deduct. And in the exact same statutory amendment in which M was enacted, A3 was enacted to specifically address contract support costs. So instead of drawing a negative implication from M, I think I would just look at the provision just joined at the hip in the exact same enactment, A3, that specifically addresses the issue of contract support costs and said that we can recover all costs that are in connection with the operation of the federal program, which I think includes program income. It's the same word, program, in both provisions. Do you agree that to be an A3 cost it has to be an A2 cost? So I don't agree, but even if I'm wrong on that, it doesn't affect our position one bit. Thank you. Justice Barrett? Okay, tell me why it doesn't affect your position one bit, because it seems to me under A2, you know, there are two qualifications in Cap A and Cap B, and I think B doesn't seem to fit very well, so it would have to be A, but that doesn't seem to fit very well either. So explain to me why that's wrong. I don't agree, Your Honor. I don't even think it's disputed that we satisfy Cap A and Cap B. I think the government is disputing the earlier part of the statute talking about a contract to ensure compliance. So, for example, Cap A covers things like stuff that the OPM would do, human resources, or contracting services that GSA would do. You mean like everybody keeps talking about workers' comp? Yeah, well, that's another thing. That's another thing, okay. So overhead, most of these costs are actually indirect costs, not direct costs, which would be workers' comp. So, for example, you know, the tribe wants to hire someone, okay. There needs to be an HR person. So if IHS is running health care, OPM, a separate branch of the government, is going to be doing all that HR stuff, putting them on the payroll, making sure they're paid, handling their pensions. So that's an A cost. Okay. And so the tribe gets that from the government because, you know, if IHS isn't paying for it, nor should the tribe. So what we're seeking in this case are all costs that fall under A or B. It's the exact same type of overhead that the secretary wouldn't pay out of pocket. It's just with respect to the programs funded by the program income. So, for example, you know, if there's contracting, GSA would do the work. If IHS was handling the program, we're doing the work when we're handling the program. That's the money we're seeking, just A and B money. And, again, the government does not dispute, as far as I can tell, that we satisfy A and B. All they're disputing is whether we're acting as a, quote-unquote, contractor, which is the earlier part of two. And I think we are because we are carrying out our contractual obligations when we perform these services under the law. In the same way that the secretary would. In the same way that IHS would if IHS were spending the third party. One hundred percent. IHS is required to collect the third party money under 1623 and then spend it. So we're stepping into their shoes. We also are required to collect that money and spend it. And so we're just asking to be put into their shoes for purposes of contract support costs. And when you spend it, when you're standing in their shoes, this back and forth about what furthers the general purposes of the contract, you would say, or would you not say, that you can only claim these contract support costs for expenditures that are of the sort that IHS would also make? Or is it a broader universe? No, because IHS also has a lot of discretion. So it says for us, further the general purposes of the contract. But IHS has a very, very broad discretion to spend the money on Indian health care as well. Like, it's true it's possible that we might spend a particular dollar differently from how IHS would. But, first of all, that happens with a secretarial amount, too, because the whole point of this statute is to promote self-determination. It reflects the assumption that the tribes may spend a particular dollar differently from how IHS would do it, and Congress thought that was a good thing. So both the tribe and the IHS is a measure of flexibility in spending this money on health care. Individual dollars might be allocated differently. But the types of things we're doing, spending money on health care, are exactly the types of things that IHS would be doing with the same money. Which might be a reason why your concession is wise, that it can't be spent on non-Indian health care, because IHS wouldn't spend it. Absolutely not. You couldn't stand in their shoes for that. No, 100% no, we cannot spend, and we do not spend this money on non-Indian health care. If an employee of our program uses the blood pressure facilities or goes to the dentist at one of our clinics, they pay from their own insurance. But you're collecting the overhead costs of that and contract support costs, because you don't parcel that out, right? So that's not an issue that's been raised in this case. Just because it's so de minimis, I think we haven't done that. It's possible in a different case the government can say you have to parcel it out, and that's an issue that can be litigated. Is there anything that you spend these third-party funds on that IHS does not? Or is it complete overlapping? So in some of the years after the years in question, I think we've spent some of the money on facility construction, which IHS doesn't under these riders. But again, the federal government spends money on facilities. They're just a separate stream of appropriations. But in general, when we do that, and again, that representation, I believe, is accurate, because these are years after the years in question. Even when we've done that, we don't consider that to be included in the base. As I said, we deduct the cost of construction. Okay. Thank you. Justice Jackson? So I just want to be clear on the purposes of the contract, because that's the most interesting thing that I think I've heard you say. Looking at the joint appendix, the contract agreements are here, and there are enumerated purposes. I'm looking at JA-51, 52. So it's your position that these third-party funds would have to be spent for one of these enumerated categories. Yes, that's actually spent on Carlos's contract. Oh, I'm sorry. That's not yours. That's 124, 125. Yes. So it says general purposes, which might modify purposes a little bit, but as a practical matter, we spend all the program income on the services on 124 and 125. Would you have to? Yeah, I think so. I think we do have to. I don't think general purposes modifies purposes to a sufficient degree that we can just go on a frolic and spend money on some completely different thing. So that's also an answer to Justice Barrett's question, that it's a limitation on you. That's how we understand it, yes. Thank you. Thank you, Counsel. Maybe I'll begin with Justice Jackson's question about page 51. We have six programs here, including the EMS program, which is a major feature of the government's motion to dismiss as the subject of this case. The third-party revenue spending has to be anchored to those six programs. It cannot be spent on a dental program. We don't see dental there. It cannot be spent just on general health. Even interpreting that term broadly and generously in light of the Indian canon, it still has to be anchored in these six programs. With regard to these six programs, when the Indian Health Service awarded a contract to the San Carlos Apache tribe, and just visualize this, we're talking about 1.8 million acres, about 29,000 square miles, 1,000 miles of roadless area, a couple hours east of Phoenix. The emergency medical service program was severely underfunded. So on page 101, the Indian Health Service demands that the tribe agree to a clause that says in running the EMS program, it will maintain an efficient billing system to maximize third-party revenues. Why? Because IHS knew that there was no way this program could be run at even a moderate level without third-party revenues coming into the program and going out into the program, coming in from program income and going out into services. So that's why this clause is such a pivotal element of the contract. Now, we rely on M1, and M1 was enacted in 1994, but that was not the first time the concept that program income goes into the contract was invented. First of all, it is a standard government contracting clause in the OMB regulations. You can go to CFR 200.307, I think it's E2. But more specifically, the Indian Health Service, in the sample contract that the Indian Health Service had in the 1980s, required that all program income be spent to provide additional services and benefits under the contract. So this was an old concept, not a new concept that Congress put in there in 1994. Well, why did Congress put it in 1994? There it was in the sample contract that IHS had because Congress decided that IHS could not be trusted to administer this program at all. That was a positive provision that program income comes into the contract, but there were a lot of negative provisions in the old sample contract. There were a lot of negative provisions in regulations that IHS had proposed to adopt in January of 1994. So Congress comes in, clears the decks, says, we are declaring what the master contract is going to say, we are prohibiting a raft of things that the agency proposed in these regulations, but we are cementing the good things. And one of the good things was M1, that all program income had to go to further the general purposes of the contract. So to the question about A2 and A3 and how they relate, they require the administration, the overhead has to be in connection with the expenditure of the, excuse me, with the administration of the contract. And the contract, as we just saw, requires the spending of program income. So we satisfy A3. It's, of course, part of the federal program that we discussed earlier. The federal program includes direct service spending from the secretarial amount and also program income spending. So an IHS spends both tranches of money. The tribe spends both tranches of money. So it's indisputably part of the federal program. You've heard questions about the situation where the tribe may be spending money on services that go primarily to non-tribal members. What is your principle for limiting that, if there is one? Right. Well, of course, as Justice Kavanaugh pointed out, it's not presented in this case, but I will answer the question. The issue of the government's obligation with respect to services to non-beneficiaries has been litigated in another setting. Contract support costs are not the only mandatory spending under the Act. There's also leasing that is mandatory spending. If a tribe uses a tribal facility to run the federal program, then the federal government needs to pay the leasing costs. That issue has been litigated, and the courts have held in the Jamestown case that there's a reasonableness limitation to the leasing costs. Incidentally, reasonableness comes up twice, once in A2, once in A3. So there's a reasonableness limitation on the overhead also. So that's just thing one. But that presumably doesn't have anything to do with the allocation between tribal members and non-tribal members. With respect, Your Honor, it would mean in this situation that if there were substantial overhead costs associated with services to non-beneficiaries, then you would discount that element, and IHS would not be responsible for reimbursing it. And I should note that IHS has a mechanism already for doing this. IHS does this in the leasing arena. If I go to IHS and ask for a lease to compensate for the use of a tribal facility, IHS will ask for data. How many non-beneficiaries do you serve? Zero. Then they cover the whole lease. Fifty percent, which is unheard of, but 50 percent. Well, there are examples, I suppose. Then IHS will whack off a part of the leasing cost to be sure that they are only supporting services to Indians, because this is an Indian health care program. I also wanted to address the question of whether the tribe can use this money for something that IHS itself couldn't use the money for. I think Mr. Unikowski to Justice Barrett in that last colloquy at the very end noted facility construction, and I wanted to follow up with you on that since you're here on facility construction. If that happened with the use of the third-party income funds, overhead costs, your answer. Thank you, Your Honor. As Mr. Unikowski indicated, we don't have a separate appropriation for construction. IHS does. That's how they get their construction money, a quarter of a billion dollars. Okay, I'm going to stop you there. That is not an answer to the statutory question that Justice Barrett was posing. That's a real-world answer, which is a good real-world answer, but I don't think it's a great statutory answer. I agree with you, Your Honor, that if a construction activity serves the general purposes of, let's just take the EMS program, then it's under the umbrella. It's within. Let's consider it. So building a garage to house the ambulances or to do maintenance work on the ambulances. Roger. To build a new facility where the ambulance crews were sleeping because they were decrepit and there were holes in the walls, and it was not an acceptable place for ambulance crews to sleep in between calls. So, yes, reconstructing a new facility to house the ambulance crews, absolutely. Are those construction activities things that the tribe can do with the third-party revenue money, but that IHS cannot do because it needs permission from Congress? Yes. Yes is the answer to that. Yes, that is the answer to that question. And the overhead for that, just to follow up on that, the overhead for that, or maybe you already answered this. No, but thank you for asking the question. So the overhead on that, just as you and I hired. That's what you're seeking, right? Yes, but there would be no overhead on it, is what I was about to say, Your Honor. Unless I'm a general contractor building my own house, I hire a company to build a new house, and the tribe hires a company to build that garage. It doesn't build it itself. So the company that hires charges you $500,000, a million dollars, to build that garage. You don't have any overhead. You just procure the contract, but you're not running the contract. So this is why my plan is this. Counsel, you're taking a long time to answer the bottom line. Are you going to include any overhead as contract support? No. Thank you. On the question of who's going to pay for this, and the reason I'm looking at this is not some kind of fiscal responsibility cannon or something. It's just trying to figure out how Congress would have been thinking about this. But if the discretionary cap stays the same, the money here, and I asked Mr. Unikowski this, the money here will necessarily come from other tribes receiving, who don't provide the health care services themselves, where IHS provides the health care services directly. So that's almost logically necessary, right? That doesn't defeat your argument, but it does perhaps shade how we think about the overall structure of the statute a little bit. I would incorporate by reference everything that my friend said except the answer to that question. CBO will advise the appropriations chairmen and chairwomen in the Senate and the House what the spending projections are for the next year. So if your honors make a decision here in fiscal year 24 and we're looking at fiscal year 25 or 26, they will make that decision to the appropriators. They will provide that information to the appropriators. The appropriators then have to divvy up the appropriation in 13 pieces, mindful of what they learned from CBO about all 13 of those. This cost, let's say it goes up $500 billion. I have no idea what it would be. There's no data on that. Then that is an element that the appropriations committee decides in allocating the 13. Then when it gets to the Environment and Natural Resources Committee, that committee decides how to further divvy it up among the American Indian Museum and the BIA and the Interior Department and all of its agencies at the Interior Department. There is no way to predict what the ultimate impact would be on the funding of the Indian Health Service, none at all, to suggest that, no, no, it's going to be a dollar-for-dollar impact on Indian services. It wasn't after the Rema case. Right. So that's a reasonable answer to that question would be, well, you're assuming the discretionary cap would stay the same, but you're wrong. I'm wrong in thinking that the discretionary cap will necessarily stay the same based on the process. That's a predictive judgment you're making. And part of it is because the IHS appropriation is an $8 billion or $9 billion appropriation inside a $55 billion appropriation, which is inside a $700 billion discretionary appropriation. So there's just no way really to predict that. How much money are you seeking in this case? $1 million a year, Your Honor, for three years, each a three-year contract. For basically EMS services. Basically EMS services and some of the suicide prevention and substance abuse programs the tribe has. Did I hear you say that these were three-year contracts? Contracts can be three years. These were three-year contracts. With the government, with the IHS? Yes, and they're recurring. So after three years, you sign up for another three years if you want to. And they could be renegotiated at that time? Absolutely. Absolutely. And what will you do with that $1 million a year? As a contract recovery under the Contract Disputes Act, Your Honor. If that's the question, then... What services will you provide with that? Oh, yes. Well, the EMS service, let's take that again, suffers from being able to hire sufficient personnel. They pay excess overtime. So if they could hire another crew, then they wouldn't be paying that overtime. They would upgrade, constant upgrade, I must say, the ambulances driving on country roads. So they would upgrade ambulances, upgrade equipment in the ambulances, and upgrade the training of the EMT crews. This is just the normal work of an EMS program, and most importantly, reduce response time. And do you provide any services to non-Indians? No, Your Honor. Let me ask you what I hope is just a simplistic clarifying question. So am I right that both parties agree, and the government can correct me if this is not the government's position, that the cost of collecting third-party income fall under 5325A1 as part of the secretarial amount, and what you're arguing is that the cost of spending the income or contract support costs covered by 5325A2? Well, A2, Your Honor, covers overhead. So with respect to the first half of your question, the cost of providing the EMS program in the first instance? No, no, I understood the third-party income question to be divided into collection and spending, and that there was no dispute that collection is covered, and that the reason why collection is covered is that it falls under 5325A1 in the secretarial amount, and so that what we're trying to find is a home for spending, and you say that home is not 5325A1 but 5325A2. Right. If I may, Your Honor, the program collection activity is an A1 activity, and we can find where the billing operations are spelled out in the contract. Overhead on the program collection activity is an A2 cost. So even as to the secretary, there are two buckets funding the tribe. Okay. The activity itself and the overhead associated. But A2, like A3, isn't limited to what comes to the tribe under A1. A2 is limited by the terms of the contract, not by the terms of A1. I know the government's brief on page 2, I think, dices and rearranges the words, but the costs are to support the contract and contract compliance costs. So the touchstone for A2, like A3, is what does the contract say? So the overhead that's covered by A2 and A3 is to support anything that's in the contract, and that contract includes spending program income. And with regard to breaking the bank, by the way, you're only talking about an average indirect cost rate around the United States of 25%, although my client's rate was 17%. So they lost that on about 17% of the program income spending they should have had. That's important. But what's really important under the Indian Self-Determination Act is they couldn't do what IHS could have done. If I could just take a moment, had IHS been in the situation that the tribe was in, running a $10 million program a year, and IHS had 50% program income to spend, and then its own appropriations to spend, 50-50, IHS wouldn't have to take one dime. All of that money would be locally spent to provide care. But when the tribe comes in, if it has a 25% indirect cost rate, and we had $5 million from one source, $5 million from another source, $10 million total, $2.5 billion required for indirect costs, we have to fund some of that $2.5 million out of the program revenue that came into the tribe. IHS doesn't have that. They get the benefit of the whole $10 million. And the tribe would get the benefit of the whole $10 million if the whole overhead were reimbursed on top. But is that partly explicable by the fact that, I mean, you know, like for Medicare and Medicaid or private insurers, that overhead is partly built into that? No, the overhead comes in when we spend the money. I mean, if we spend the money to increase salaries, we spend the money to add in other things. No, no, no, but if a hospital got paid, just say not a tribal medical facility. Yes. Well, I'll finish that up there. But if a hospital got paid Medicare and Medicaid money, the hospital can do anything it wants with it. It's not required. It's not limited by any federal statute in the use of the money. And if a doctor, the same. If the doctor receives money from Medicare and Medicaid, it can use it to pay the scholarship of its son. Thank you, counsel. Justice Thomas? Justice Alito? Well, just to follow up on a few questions that were asked earlier, in assessing what Congress thought this whole scheme would amount to, do you think it is illegitimate to consider how much it will cost? I don't think anything is illegitimate in terms of considering what Congress might have expected. But I do think we have to look at what Congress did in 1994. All right. So it's not illegitimate. That wasn't an illegitimate line of inquiry. And the government has been accused of making up a number and trying to smuggle it into the case without record support. I take it you disagree with their number? Well, I disagree with their number, and today the government said that their number was concocted partially on the assumption that we were talking about overhead associated with services to non-beneficiaries, which we're not. Do you have a number? We do not have a number. All I know is for the San Carlos Apache tribe, it's about a million dollars a year. Well, do you think in a case involving the interpretation of the statute, the question is what the statute means and what it will mean as applied to in all the instances in which it will be invoked, or just what it would mean in a particular case that happens to come before the court? The question I ask myself is what did Congress intend when it enacted the statute, because we're bound by the text of the statute. And Congress in 1994 said that program income was going to be part of the contract, and it knew that the agency had for more than a decade also said that program income was part of the contract, and it wrote the contract support cost revision to be key to the contract. Thank you. Thank you, Your Honor. Justice O'Meara? Justice Kavanaugh? Justice Jackson? Thank you, Counsel. Thank you. Rebuttal, Ms. Flynn? Thank you, Mr. Chief Justice. Just a few points. So first I do want to emphasize at the outset that we have been talking a lot today about the funding provisions in 5325A and M and how those work together, but there is a separate prohibition that does apply, notwithstanding any other provision of law, and that says that IHS cannot pay costs that are not directly attributable to the ISDA contract. Here there is an extended chain of causation. The tribe has to first perform services that are eligible for receiving reimbursements. It then has to collect that money, then decide how to spend that money, which may not even be during the same contract period, and then it has to be the kind of expenditure that generates what would otherwise be an eligible contract support cost. That is too extended of a chain to fit within directly attributable, and so the payment of these funds is independently barred. The second thing I want to address, this question of whether when we're talking about the kind of third-party reimbursement income that can trigger this corresponding contract support cost obligation from IHS. There were questions about whether that kind of income includes income from serving non-beneficiaries or just income from serving Indians, and I took my friends in the northern Arapaho to say that they do consider the program income they're talking about in this case to include both kinds of reimbursement revenue. That is how I understood the arguments to be in this case thus far, but I also took my friends on the other side to say that you do not have to decide that question about whether the kind of reimbursement income that could potentially trigger CSC from IHS includes income from serving non-Indians, and I would encourage the court at the very least to reserve that issue and not decide whether that amount of income can include that kind of income stream. There were also questions about our budget estimate in this case, about the repercussions of this case. I do want to clarify that, yes, our estimate is based on, if you base contract support costs on all kinds of third-party reimbursement income that can come in, and so it is tied to that, but that estimate is tied to the available information we have. We do not have reliable information about how much third-party reimbursement income tribes are bringing in per year, including whether it comes from serving non-beneficiaries or beneficiaries, because IHS does not have reason to collect that information in a comprehensive way, but we can look at the value of the claims that have been made so far, and we can look to how much third-party reimbursement income IHS brings in to make estimates. The value of the claims we are seeing so far, we are already facing a claim in the District of Arizona seeking nearly $110 million in additional contract support costs for a single contract year. We are seeing other claims for $40 million for a single contract year and $90 million for another contract year. In one of those cases, the Gila River case, there is a single fiscal year where what the tribe is saying that they are owed in contract support costs is about $48 million, and that is the total including what they were already paid, and that comes close to what they received in the secretarial amount for that same year, which was $51 million. So our prediction that this will eventually overtake the secretarial amount we think is sound, and that is in part because of the allegations like those in the San Carlos Apache's complaint that if they had received an additional $3 million in contract support costs, they would have been able to produce another $5 million in third-party reimbursement income, and that is part of the damages claim that they are seeking against us in this case. I would also say that our estimate about the forward-looking budget impact does not include the value of any of these retrospective judgments that do have a six-year statute of limitations. Finally, just one final point. There has been discussion about what falls within M1, sorry, 5325M1, and what counts as being within the general purposes of the contract. I understood my friends to be saying it has to be very closely tied to contract services, although there seems to be some expenses like billing facilities, which can be done under ISDA but has to be done under a separate ISDA contract if the tribe wants to fund it that way, but they think that they could fund that using third-party reimbursement income. I would say also, though, that M1 has to be read consistently with 1641D2. This is the provision of the IHCIA that also governs the same reimbursement income, and that provision says that tribes can spend it on any healthcare-related purpose or otherwise to achieve the general objectives of the IHCIA. You have to read those consistently. It can't be that M1 forbids uses that this other provision permits, and so that's why I do think that the idea that tribes are limited to spending this just on program services cannot be correct. If there are no further questions, we ask that you reverse in both cases. Thank you, Your Honor. Thank you, Counsel. The case is submitted.